THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CONNIE SHAW, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | CAUSE NO. 3:05-CV-094RM |
| ) | |
| GDX NORTH AMERICA d/b/a, ) | |
| GDX AUTOMOTIVE, INC., ) | |
| ) | |
| Defendants ) | |

OPINION AND ORDER

Connie Shaw sues her former employer, GDX North America, alleging discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. GDX seeks summary judgment on her sole claim of discrimination and, for the reasons that follow, the court grants its motion.

FACTS

The following facts are taken from the summary judgment record and are viewed as favorably to Ms. Shaw as is reasonable. Ms. Shaw worked at GDX's Wabash Indiana facility in the fall of 1999 as a press operator in department 239. GDX employees at this facility are assigned to different departments and rotate through various jobs as mandated by the collective bargaining agreement between GDX and the United Steel Workers of American, of which Ms. Shaw was a member.

As a press operator, Ms. Shaw placed rounded rubber moldings into a press that sealed them into one piece. When the moldings were removed, she would trim the excess plastic using scissors and box cutters. Ms. Shaw also held a position called the "D-bar" job, in which she would clamp a long piece of rubber down, change the blades on the trimmer, and push the sealed rubber pieces through a buffer. Ms. Shaw would then stack the rubber pieces in a wheeled cart, which she would push a short distance; the cart weighed approximately one-hundred and eighty pounds.

After working for four months as a press operator, Ms. Shaw was placed on a formal leave of absence when the USWA requested that she work for it as an interpreter and organizer in its Indianapolis office. Ms. Shaw was involved in two automobile accidents while working for the USWA that winter and didn't work for the Union after November 2000. Because at least one of Ms. Shaw's accidents occurred during the course of her employment, the USWA's worker's compensation carrier covered her injuries.

Ms. Shaw was released from working for the USWA on April 27, 2004. She returned to the Wabash facility with the Union president to be introduced to Lance Connoy, who was the human resources manager and the person responsible for returning employees to work after a medical leave. Ms. Shaw presented Mr. Connoy with a medical release dated that same day from her personal physician, Dr. John Levine. Mr. Connoy didn't know Ms. Shaw, and at the time, had no information concerning her medical condition. After speaking briefly with Ms.

Shaw, Mr. Connoy contacted Teri Kendall, an occupational health nurse at GDX, who told him Ms. Shaw had been in an automobile accident. Mr. Connoy later described Ms. Shaw as looking "very healthy and fit" and "fine for work," but because he didn't know whether she could return to work under the collective bargaining agreement, or whether she was physically fit to work, he denied her immediate reinstatement.

The collective bargaining agreement between agreement GDX and the USWA required job assignments based on seniority. Mr. Connoy testified that "we considered all jobs that she [Ms. Shaw] had seniority for, because the union never came forward to say we want to make some special accommodation here, you know, regardless of seniority." He testified that Ms. Shaw had sufficient seniority for departments 239, 350, and 370.[1] Mr. Connoy also said she possibly had seniority to work in department 235, and that she was eligible to bid on positions in departments 253 and 254 if there was a job posted, but because those departments were represented by a different union— the Teamsters—she could only be awarded the position if no other Teamster member had bid on it.

Before Ms. Shaw's request to return to work, GDX had a physical therapist determine the physical requirements of certain of the Wabash facility's

---

[1] Ms. Shaw says she wasn't considered for any other departments other than department 239, but the record doesn't support her assertion. Nurse Kendall testified that she personally didn't consider Ms. Shaw for positions outside department 239, but this testimony isn't inconsistent with Mr. Connoy's testimony because she indicates that she is unsure of whether Mr. Connoy considered other departments. A letter from Andreas Lohmar states that he considered, at Nurse Kendall's request, whether Ms. Shaw's push/pull ability allowed her to work in department 235, 350, and 370. Ms. Shaw offers no competent evidence that contradicts Mr. Connoy's testimony.

3

departments. Department 350 required the ability to push or pull up to 80 pounds for up to one-third of the day; department 370 required the ability to push or pull up to 75 pounds for up to one-third of the day. Both departments also required the use of hand tools. GDX also retained a physical therapist after Ms. Shaw's request to determine the physical demands of department 239, which included the ability to lift 80 pounds from waist to shoulder for up to one-third of the day; the ability to carry 50 pounds over a distance of 40 feet for up to one-third of the day; and the ability to push or pull up to 70 pounds over a distance of 40 feet for up to one-third of the day. The positions in department 239 also required frequent grasping and occasional fine finger movements.

In investigating Ms. Shaw's request to return to work, Mr. Connoy reviewed Dr. Levine's examination of her, but gave that recommendation little weight. Dr. Levine examined Ms. Shaw on April 19—a week before her meeting with Mr. Connoy. He noted she suffered from "chronic neck pain," and that her "range of motion [was] restricted by discomfort and stiffness." A week later, Dr. Levine issued Ms. Shaw's medical release, but the record is unclear as to whether he examined her at that time.[2] Dr. Levine then examined Ms. Shaw on July 3. He noted she suffered from a "neck injury with satisfactory pain relief" but desired to

---

[2]Although GDX says the absence of medical notes for Ms. Shaw's April 27 visit indicates the lack of a formal examination by Dr. Levine, all reasonable inferences must be drawn in Ms. Shaw's favor at the summary judgment stage. GDX also says Nurse Kendall spoke with Dr. Levine's nurse who told Nurse Kendall that Dr. Levine had issued the release without an examination, but a review of the record doesn't support this assertion. The court cannot say she wasn't examined on April 27.

4

return to work, and that she had "reasonable range of motion although there [was] restriction at the limits of lateral rotation and extension." Dr. Levine again recommended that Ms. Shaw could resume working.

GDX's human resource department also reviewed a letter from Dr. Mark Reecer, who was treating Ms. Shaw in connection with her worker's compensation case against the USWA. Dr. Reecer examined Ms. Shaw on April 20, and he noted that she had "neck and trapezial pain … [ ] intermittent numbness and tingling in both hands," and that her "symptoms increase with standing, driving, coughing, and sneezing." He recommended that she undergo a functional capacity exam. Nurse Kendall also recommended a functional capacity exam. She didn't know whether Ms. Shaw had any restrictions, but like Mr. Connoy, she questioned Dr. Levine's work release. Dr. Levine's nurse told Nurse Kendall that the human resources department should follow Dr. Reecer's recommendation that Ms. Shaw should undergo a functional capacity exam.

Ms. Shaw underwent a functional capacity exam on June 29. Dr. Reecer prepared a summary report indicating that she had the following restrictions:

- she couldn't lift more than 20 pounds from her waist to her shoulder;
- she couldn't lift more than 15 pounds over her head;
- she couldn't carry more than 30 pounds with two hands;
- she couldn't push or pull more than 30 pounds; and
- she didn't qualify for frequent or constant use of hand tools.

5

Dr. Reecer determined that Ms. Shaw could perform many other physical movements including constant walking, sitting, squatting, and standing; frequent bending, kneeling, stair climbing, and reaching; occasional crawling; and fine hand movements. Based upon the results, Mr. Connoy sent Ms. Shaw a letter telling her that GDX could not accommodate her physical restrictions, and that she wouldn't be allowed to return to work at the Wabash facility.[3]

## DISCUSSION

Ms. Shaw alleges that the GDX regarded her as disabled, and that it violated the ADA when it failed to accommodate her physical restrictions. The ADA prohibits an employer from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...." 42 U.S.C. § 12112(b)(5)(A). To establish a case of disability discrimination, a plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) that she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) that she suffered from an adverse employment action because of her disability. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005). Only if a plaintiff can establish a

---

[3] After Mr. Connoy sent Ms. Shaw this letter, the union suggested two additional positions within department 239 it believed Ms. Shaw might be able to perform, so the human resource department contacted a physical therapist to determine whether her physical restrictions would allow her to perform the requirements of either of the proposed positions. The physical therapist determined that the suggested positions required physical capabilities her functional capacity exam showed she didn't posses.

6

prima facie case does the burden shift to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Dvorak v. Mostardi Platt Assocs., Inc., 289 F.3d 479, 485 (7th Cir. 2002) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). GDX says it is entitled to summary judgment because Ms. Shaw cannot show she was disabled, or that she could perform the essential functions of the available jobs at the Wabash facility with or without reasonable accommodation. The court agrees.

Ms. Shaw can establish that she is disabled within the meaning of the ADA by showing either (1) she has a physical or mental impairment that substantially limits her in one or more major life activities, (2) she has a record of such an impairment, or (3) GDX regarded her as having such an impairment. Nese v. Julian Nordic Constr. Co., 405 F.3d at 641 (citing 42 U.S.C. § 12102(2)). Ms. Shaw concedes that she isn't disabled, but says that GDX regarded her as disabled.

Under a "regarded as" claim, a plaintiff must prove that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity. Id. The employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)). Major life activities include

7

"caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

Ms. Shaw says GDX regarded her as substantially limited in her ability to work, as well as having some limitation in her ability to walk and perform the manual task of using hand tools. The court doesn't agree. To show she was regarded as disabled, Ms. Shaw must show more than "some limitation" in a major life activity, and there isn't any evidence in the record to allow a rational trier of fact to reasonably conclude GDX regarded Ms. Shaw as substantially limited in her ability to walk. *See* Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002) ("The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities."); *cf.* EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 802 (7th Cir. 2005) (holding that a reasonable jury could find that a plaintiff's neuropathy, which prevented the plaintiff from walking more than one city block, was a substantial limitation compared to the walking that most people do daily). Moreover, the manual task of using hand tools isn't a central part of most people's daily lives, so it isn't a major life activity. *See* Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. at 197 (rejecting the employee's claim that her carpal tunnel syndrome, which made it impossible to perform certain manual tasks on the job, was a substantial limitation on a major life activity); *see also* Mack v. Great Dane Trailers, 308 F.3d 776, 781 (7th Cir. 2002) ("When addressing the major life activity of performing manual tasks, the central inquiry must be

8

whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job.").

To establish that GDX regarded her as substantially limited in her ability to work, Ms. Shaw must show a perceived "inability to work in a 'broad range of jobs.'" Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. at 200. Because the substantial foreclosure from the job market isn't obvious, Ms. Shaw must present " 'some evidence of the number and types of other jobs' in the geographic region, from which [s]he would be excluded because of [her] perceived impairments." Kupstas v. City of Greenwood, 398 F.3d 609, 613 (7th Cir. 2005) (quoting EEOC v. Rockwell Int'l Corp., 243 F.3d 1012, 1017-1018 (7th Cir. 2001)). In other words, an impairment must "substantially limit employment generally," id. (quoting Stein v. Ashcroft, 284 F.3d 721, 725 (7th Cir. 2002)), not merely preclude an employee from performing "either a particular specialized job or a narrow range of jobs." Id. (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(j)). Ms. Shaw cannot satisfy her burden by "showing only that [GDX] believed that [s]he could not perform a specific job." Id.

Ms. Shaw points to GDX's denial of her request to return to work at the Wabash facility as evidence that it regarded her as substantially limited in her ability to work. She says GDX believed she was unable to work in any position at the Wabash facility. The court doesn't agree.

9

Ms. Shaw's functional capacity exam results showed she could neither perform certain pushing, pulling, and lifting functions nor use hand tools frequently or constantly.[4] The functional exam also showed she could perform many other physical movements, including constant walking, sitting, squatting, and standing; frequent bending, kneeling, stair climbing, and reaching; occasional crawling; and some fine hand movements. Mr. Shaw doesn't point to any other evidence that suggests GDX believed she was physically restricted in any other manner. As such, the evidence in the record supports one conclusion: that GDX believed Ms. Shaw was limited only in her ability to perform tasks associated with specific positions because she couldn't lift more than 20 pounds from her waist to her shoulder, lift more than 15 pounds over her head, carry more than 30 pounds with two hands, push or pull more than 30 pounds, and frequently and constantly use hand tools.

These restrictions precluded Ms. Shaw from working at the Wabash plant because of her lack of seniority, but they don't substantially limit her general ability to work. See Kupstas v. City of Greenwood, 398 F.3d at 613 (employer didn't regard plaintiff as disabled due to lifting and raking restrictions imposed because of his back condition even though the employer believed he couldn't perform the essential functions of his laborer position, absent evidence as to the class or range of jobs for which he otherwise was qualified, and from which the

---

[4] Mr. Lohmar also compared the physical demands of department 235, 350, and 370 with Ms. Shaw's functional capacity exam, and he reported to GDX that she couldn't perform certain push and pull requirements, but she could meet all other physical demands.

10

employer perceived him to be excluded); *see also* Peters v. City of Mauston, 311 F.3d 835, 844 (7th Cir. 2002) (finding no substantial limitation to the ability to perform the major life activity of working where plaintiff couldn't lift more than 50 pounds, shovel for more than 30 percent of a workday, or use of his shoulder for more than 2 hours continuously or 6 hours in a day); Contreras v. Suncast Corp., 237 F.3d 756, 763 (7th Cir. 2001) (noting that other circuits dealing with similar cases where a plaintiff is restricted from heavy lifting also have held that such limitations don't constitute a substantial limitation on working). Like the plaintiff in Kupstas v. City of Greenwood, Ms. Shaw has very specific restrictions, and she has offered no evidence (aside from the restrictions themselves)to show that she is limited in her ability to engage in a class or range of jobs. Ms. Shaw cannot show GDX regard her as substantially limited in a major life activity.

Even if a trier of fact could conclude Ms. Shaw is disabled within the meaning of the ADA, summary judgment still would be appropriate because she hasn't presented sufficient evidence that she could perform the essential functions of an available position at the Wabash plant with reasonable accommodation.

Under the ADA, an employer can be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential functions of the job she held; the employer, however, isn't required to create a job that will enable the disabled worker to work despite her disability— the employer need only transfer the employee to a position for which the employee is otherwise qualified. Jackson v. City of Chicago, 414 F.3d 806, 812-813 (7th Cir. 2005). The

ADA doesn't require that disabled individuals be accommodated by "sacrificing the collectively bargained, bona fide seniority rights of other employees." Eckles v. Consolidated Rail Corp., 94 F.3d 1041, 1051 (7th Cir. 1996).

The collective bargaining agreement between GDX and the USWA requires job assignments based on seniority—employees with more seniority are allowed to "bump" employees with less seniority. GDX says it tried to make reasonable accommodations by considering Ms. Shaw for positions within departments for which she had enough seniority—departments 239, 350, and 370. Ms. Shaw says she was injured while on leave from working for the USWA, so she should've been exempt from the seniority provision applicable to job attainment. She cites Article XIV, section 11of the agreement which provides in part:

> Employess who are on leave of absence, medically restricted layoff or worker's compensation disability may be transferred to jobs and departments other than their own without regard for seniority until such time as they can return to their regular job by mutual agreement between the Human Resource Manger and Union President.[5]

Ms. Shaw, though, doesn't point to any evidence that Mr. Connoy and the USWA president had reached a mutual agreement that the seniority standard as applied to her should be waived. GDX had a duty to consider only those positions within departments for which Ms. Shaw had sufficient seniority. Eckles v. Consolidated Rail Corp., 94 F.3d at 1052.

---

[5]Ms. Shaw also cites Article XVI, section 1 of the agreement, but that provision deals with special consideration when laying off surplus labor for employees who are on worker's compensation or who have suffered disabilities at the Wabash plant, and who GDX and the Union have agreed couldn't secure employment elsewhere, so it isn't inapplicable.

Ms. Shaw says she could perform the essential functions of the positions in departments 239, 350, and 370. In support of her argument, she points to her affidavit and the attached unsworn statements of three GDX employees—Carl Selleck, Debra Smith, and Jim Beahl. She says the statements contained in her affidavit and its attachments directly contradict GDX's assertion that she couldn't perform the essential functions of the positions in these departments. GDX says Ms. Shaw's affidavit and its attached papers shouldn't be considered in opposition to summary judgment because they don't meet the requirements of FED. R. CIV. P. 56(e). The court agrees.

Rule 56(e) requires that an affidavit opposing summary judgment "be made on personal knowledge, [ ] set forth such facts as would be admissible in evidence, and [ ] show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Id. The requirement that an affidavit be "sworn" requires more than just the use of the word "sworn"; the affidavit must be sworn before an officer authorized to administer an oath (such as a notary public). *See* Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir.1985). An unsworn declaration may be substituted for an affidavit, but only if it subjects the declarant to the penalties of perjury. *See* 28 U.S.C. § 1746. Statements that are "neither notarized nor made under penalty of perjury [do] not comply with Rule 56(e) .... [and] [courts] can simply ignore them." Gilty v. Village of Oak Park, 919 F.2d 1247, 1255 n.13 (7th Cir. 1990).

13

Ms. Shaw's statement isn't an affidavit because it isn't sworn, nor does it subject her to the penalties of perjury, so the court doesn't consider it. The court also doesn't consider the attached statements of the GDX employees because they aren't authenticated as required by Rule 56(e), nor are they made under the penalties of perjury or otherwise verified. *See* Friedel v. City of Madison, 832 F.2d 965, 970 (7th Cir. 1987) ("When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.").

The results of Ms. Shaw's functional capacity exam show she couldn't perform essential pushing, pulling and lifting functions, nor could she use hand tools, as the jobs in departments 239, 350, and 370 required. Aside from the unsworn and unverified statements, Ms. Shaw hasn't pointed to any competent evidence which contradicts the exam's findings, so no reasonable fact-finder could rationally find that she was qualified to perform the essential functions of the available positions at GDX's Wabash facility.

Still, Ms. Shaw says GDX failed to make reasonable accommodation because she had sufficient seniority to work in other departments, but she wasn't considered for those departments. Ms. Shaw has the burden of showing that "a vacant position exists for which she was qualified." Jackson v. City of Chicago, 414 F.3d at 813. "If such a position is available, then the court may consider whether 'failure to provide that accommodation was due to a breakdown in the interactive process.'" Id. (citing Ozlowski v. Henderson, 237 F.3d 837, 840 (7th

14

Cir. 2001)). Ms. Shaw points to Mr. Connoy's deposition statement that she "possibly" had seniority to work in department 235, and that she was eligible to bid on a position in departments 253 and 254 if there was an one available and no other Teamster member had bid on it. The court isn't persuaded by Ms. Shaw's argument.

Even if a trier of fact could find that Ms. Shaw had seniority to work in department 235, she doesn't point to any evidence that a vacant position in that department existed, let alone one for which Ms. Shaw was physically qualified. Mr. Lohmar's letter to Nurse Kendall indicates that he found the positions in department 235 required waist to shoulder lifting of up to 80 pounds, which exceeded Ms. Shaw's lifting capabilities as shown by the functional capacity exam. Ms. Shaw hasn't presented any evidence a of vacant position in departments 253 or 254 in April 2004 for which she was qualified, and which wasn't bid upon by a Teamster member. Mr. Connoy's testimony is speculative and, standing alone, could not permit a fact-finder to reasonably conclude that there was a vacant position for which Ms. Shaw was qualified. *See* Ozlowski v. Henderson, 237 F.3d at 840 ("Ozlowski does not provide any evidence of his qualifications in comparison to the legitimate prerequisites for any of the positions he identified or any evidence that such positions were vacant, other than his own conclusory statements."); EEOC v. Sears, Roebuck & Co., 417 F.3d at 805 ("...we ordinarily look first to whether there is a genuine issue of material fact regarding the

15

availability of a reasonable accommodation, and if it is clear that no reasonable accommodation was available, we stop there.").

Finally, Ms. Shaw apparently argues that GDX violated the ADA when it made her undergo a functional capacity exam. The court doesn't agree. The ADA's prohibition against discrimination applies to an employer's inquiries into the medical condition of an employee, 42 U.S.C. § 12112(d)(4), but employers may lawfully make such an inquiry if it "is shown to be job-related and consistent with business necessity." Miranda v. Wisconsin Power & Light Co., 91 F.3d 1011, 1017 (7th Cir. 1991). "Thus, an employer may inquire into the ability of an employee to perform functions related to his job." Id. (citing 29 C.F.R. § 1630.14(c)).

Mr. Connoy testified that returning employees sometimes are required to go through a functional capacity exam, and that while he knew Ms. Shaw had been in an automobile collision, he didn't have any information of her medical condition when she first requested to return to work at the Wabash facility. He also stated that he later learned Dr. Reecer had examined Ms. Shaw on April 20, and Dr. Reecer had noted that Ms. Shaw had neck pain and intermittent numbness and tingling in both hand and recommended she undergo a functional capacity exam. Nurse Kendall also recommended a functional capacity exam because Dr. Levine's nurse said the human resources department should follow Dr. Reecer's recommendation. There isn't evidence to allow a rational fact-finder to reasonably conclude GDX made her undergo this exam for any reason other than to determine whether she could return to working a physically demanding job after

her accident. GDX's treatment of Ms. Shaw doesn't suggest that it regarded her as disabled within the meaning of the ADA, nor does it suggest she was treated differently because of a perceived disability.

CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Doc. No. 63] is GRANTED; the defendant's motion to strike evidence from the summary judgment record [Doc. No. 67] is GRANTED; the parties' joint motion to continue trial is DENIED AS MOOT [Doc. No. 69]; and the final pretrial conference scheduled for February 20, 2007, and the jury trial scheduled for February 26, 2007 and all other pre-trial deadlines are VACATED. The clerk shall enter judgment accordingly.

SO ORDERED.

Entered: February 2, 2007

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court